

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **YASER SHUOMALI** | § | Case No. 14-60808 |
| xxx-xx-3438 | § | |
| 405 Etheridge Rd., Canton, TX 75103 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| **E&S LAND DEVELOPMENT, L.P.,** | § | |
| | § | |
| Plaintiff | § | |
| v. | § | Adversary No. 14-6019 |
| | § | |
| **YASER SHUOMALI** | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the amended complaint filed by the Plaintiff, E&S Land

Development, L.P., seeking to deny the entry of a Chapter 7 discharge in favor of the

Debtor-Defendant, Yaser Shuomali, pursuant to 11 U.S.C §§ 727(a)(2)(A) and (a)(4)(A)

or, alternatively, seeking a determination of whether an alleged debt owed to it by the

Debtor-Defendant should be excepted from discharge pursuant to 11 U.S.C.

§ 523(a)(2)(A), the Court issues the following findings of fact and conclusions of law.

This memorandum disposes of all issues pending before the Court.

---

[1]   These findings of fact and conclusions of law are not designated for publication and shall not
be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion,
the law of the case or as to other applicable evidentiary doctrines.

# FINDINGS OF FACT

1.   Yaser Shuomali (the "Debtor" or "Shuomali") is a Jordanian who emigrated from Saudi Arabia to the United States in 1995 and lived primarily in the eastern United States for many years.

2.   Shuomali subsequently relocated to Canton, Texas and, in June 2010, formed Pioneer Food Mart, Inc. as a closely-held corporation and opened Pioneer Food Mart in Canton on a location leased from his sister-in-law which had formerly been a convenience store known as Bob's Town and Country.

3.   Shuomali managed Pioneer Food Mart, Inc. to moderate financial success in its first two years of its convenience store operation.

4.   Within a few months of opening Pioneer, Shuomali also leased and managed an Exxon Quik Shop convenience store also located in Canton and engaged in other entrepreneurial ventures (e.g., used car sales) that he tried from time to time.

5.   E&S Land Development L.P., (the "Plaintiff" or "E&S") is a Texas limited partnership managed by its general partner, Ellis Spence Management, LLC.  The membership interests in Ellis Spence Management, LLC are owned by Gary Spence and John F. Hamaker.

6.   In 2011, E&S acquired a non-operating convenience store location on Interstate 20 in Canton and was searching for a lessee in the Canton area to reopen and operate that location which had been closed for six months.

7.   Family contacts of Spence and/or Hamaker located in the Canton area suggested Shuomali as a possible lessee for the new operation based upon his involvement with his other convenience stores in the Canton area.

8.   Spence and Hamaker had no prior experience with convenience stores.

9.   However, being favorably impressed after several visits to observe the apparently successful operations occurring at Shuomali's other Canton stores, they continued negotiations with Shuomali regarding his involvement as a store lessee.

10.  E&S did not examine the financial records of other Canton stores managed by Shuomali's entities prior to the execution of a lease on its Canton property.

11.     At the time of the negotiations and to the present date, Shuomali is not proficient in English.  It is difficult to understand his speech.  There was and is considerable doubt about Shuomali's ability to read and write in English.

12.     Thus, as Mr. Hamaker acknowledged in his trial testimony, the lease negotiations and all subsequent business dealings between E&S and Shuomali occurred in the presence of one or more of Shuomali's sons who were apparently able to bridge any communication divide.

13.     After further conversations, E&S entered into an Industrial Lease (the "Lease") with Shuomali on Saturday, October 29, 2011 for the Canton location described at that time as the "I-20 & Hwy 19 Convenience Store" (the "Quick Fill Store").[2]

14.     The Lease identifies the tenant as "Yaser & Sons."[3] Shuomali signed the Lease in his purported capacity as president of that entity.

15.     At the time of the execution of the Lease, there was no registered business entity nor any assumed name registration for "Yaser & Sons."[4]

16.     Thus, Shuomali became liable on the obligations under the Lease in his individual capacity.

17.     The Lease required a monthly rental payment of $5,500 for a term of five years, beginning on the date the store opened, but not later than January 1, 2012.[5]

18.     Under the Lease, Shuomali agreed not to assign the lease without the written consent of E&S[6] and E&S agreed not to unreasonably withhold consent to any

---

[2] Ex. 1.  The Lease also names "Ghalia Shuomali & Yaser Shuomali" as Guarantors.  However, Yaser did not sign the lease in a guarantor capacity and Ghalia Shuomali did not sign the lease at all.  *Id.*

[3] *Id.* at p. 2.

[4] ¶ 2 of the Agreed Issues of Fact ("Agreed Facts") as stipulated by the parties and set forth in the approved Amended Joint Pre-Trial Order ("PTO") entered in this adversary proceeding on April 29, 2016 [dkt. #53].

[5] Ex. 1 at p. 2.

[6] *Id.* at ¶ (B)(9).

proposed assignment.[7]

19.     The Lease further contained an Insurance Addendum, requiring various types of insurance coverage, including $ 5million of coverage for losses pertaining to "All Petroleum and Tanks" to be paid by the tenant exclusively.[8]

20.     Shuomali told E&S representatives that he believed that the Quick Fill Store could simply be added as another location in his existing insurance coverage.

21.     The Insurance Addendum actually required Yaser & Sons, as tenant, to procure and to provide complying insurance certificates to E&S, naming E&S as an additional insured party "*prior* to Tenant taking occupancy of the premises."[9]

22.     Notwithstanding such provision, and with the complete consent of E&S, Shuomali took possession of the Quick Fill Store immediately upon the execution of the Lease in order to make preparations for its opening.

23.     Shuomali took immediate possession of the Quick Fill Store with the consent of E&S, even though he had not complied with the insurance requirements of the Lease.

24.     On the next business day after the execution of the Lease, Shuomali created a new entity, Quick Fill, LLC, a Texas limited liability company.[10]

25.     The creation of Quick Fill, LLC was consistent with Shuomali's prior business practice of creating distinct business entities through which he offered his managerial services.

26.     Shuomali was the sole member of Quick Fill, LLC.[11]

---

[7] *Id.* at ¶ (D)(2).  At trial, neither party presented evidence that the Debtor requested to assign the Industrial Lease or that the Plaintiff denied the Debtor's request.

[8] Insurance Addendum to Ex. 1 at p. 2.

[9] *Id.* at ¶ 7 (emphasis in original).

[10] Ex. 18.  Shuomali filed an Assumed Name Certificate with the Secretary of State on November 2, 2011.  Quick Fill's assumed name was listed as "A+ Convenience."  Ex. M at pp. 8-9.

[11] ¶¶ 3-4 of the Agreed Facts.

27.     Notwithstanding its creation, there is no evidence in the record that the Lease itself was ever assigned to Quick Fill, LLC.

28.     Soon after the execution of the Lease, Shuomali inquired about adding the Quick Fill Store to his existing insurance portfolio and learned to his surprise that it was cost-prohibitive, at least from his perspective.[12]

29.     It took two months for Shuomali to prepare the Quick Fill Store for operation. He absorbed the costs of remodeling costs, including installation of air conditioning.

30.     The rental obligations began in January 2012.  The Debtor testified without contradiction that all rental payments received by E&S as to the Quick Fill Store were paid by Quick Fill, LLC.

31.     In January 2012, Shuomali created another solely-owned limited liability entity, Dakota A-1, LLC, through which he rendered management services to another leased convenience store operation near Canton known as 47 Travel Stop and/or Peckerwoods Texaco.[13]

32.     Income from the Quick Fill Store was derived from the sale of food, fuel and cigarettes. However, the Quick Fill Store encountered financial difficulties from the outset.

33.     Through the first half of 2012, Shuomali was constantly requesting rent reductions from E&S and E&S repeatedly reminded Shuomali about compliance with the insurance requirements under the Lease.

34.     Notwithstanding its initial difficulties, Shuomali thought that the operation of the Quick Fill Store represented the best long-term business opportunity among his leased stores due to its superior location.

35.     Therefore, Shuomali began to divert income from his other operations to supplement the income shortages at the Quick Fill Store.

36.     E&S lowered the rent to $3,500 for two months in mid-2012.

---

[12]  The Debtor testified at trial that he was "shocked" by the size of the proposed premium necessary to add the Quick Fill Store.

[13]  Ex. G at 5-6.  The K-1 document filings for Dakota A-1 for 2012 and 2013 confirms the Debtor's 100% ownership.  Ex. Y at 239; Ex. Z at 276.

37.    Insurance, however, was not procured on the property at the Quick Fill Store for the first eight months of operation.

38.    Shuomali finally procured insurance on the Quick Fill Store in August 2012 with Quick Fill, LLC listed as the named insured;[14] but the policy failed to list E&S as a co-insured or as a loss payee of the policy.[15]

39.    Over the next year and half, the net economic performance of all of the properties managed by Shuomali began to deteriorate, notwithstanding any illusion created from gross receipts procured by those companies.[16]

40.    In 2013, Pioneer Food Mart, Inc. was assessed a sales tax penalty of approximately $103,000.00 by the Texas Comptroller of Public Accounts.

41.    In April 2013, with rental obligations in arrears for several months, Pioneer's landlord seized possession of the store location.

42.    The Debtor learned from his accountant that he could not formally dissolve Pioneer Food Mart, Inc. due to the pending sales tax assessments.

43.    In December 2013, based upon his accountant's advice, and at a time when Pioneer had already forfeited its convenience store operations, the Debtor transferred his 1,000 shares of Pioneer Food Mart, Inc. stock to his brother, Bhaeddin Alshoumali.[17]

44.    No money was received by the Debtor for the transfer of the Pioneer Food Mart, Inc. stock.

---

[14]  ¶ 5 of the Agreed Facts; Ex. 2.

[15]  *Id*.  Though procured in August 2012, Mr. Hamaker testified without contradiction that E&S did not actually receive the relevant policy documents until the summer of 2013.

[16]  During the pendency of the leasehold, evidence of environmental contamination from the gas tanks were also eventually discovered on the property in 2013 which were remediated by E&S.  There were also TCEQ measurement compliance penalties imposed during the lease term.  No evidence was presented regarding the expense amounts incurred by E&S and, as a result, exploration of the environmental compliance issues are not germane to the causes of action presented in this proceeding.

[17]  Ex. S.

45.    In mid-2013, due to slumping sales and gasoline thefts, and in an effort to focus his managerial efforts on the Quick Fill Store, the Debtor decided to cease business operations of Dakota A-1, LLC at the 47 Travel Stop and Peckerwoods Texaco location.

46.    In September 2013, Dakota A-1, LLC transferred its business assets to 47 Travel Stop, Inc., a new entity formed by Tareq Abu Sel.[18]

47.    Dakota A-1, LLC received $20,000 from 47 Travel Stop, Inc. for the sale of the Dakota's leasehold interest and all inventory located at the leased location.[19]  The sale proceeds were utilized to satisfy existing business debts.[20]

48.    Despite his downsizing efforts, the Debtor's concentration on the management of the Quick Fill Store proved unfruitful.

49.    Shuomali defaulted on the payments due under the Quick Fill Store Lease in November and December 2013.  He abandoned the leased Quick Fill Store property in December 2013.[21]

50.    On or about April 22, 2014, E&S filed a lawsuit in Texas state district court against Shuomali and Quick Fill, LLC regarding the contractual obligations under the Lease.[22]

*Bankruptcy Case Administration*

51.    Prior to the state court petition answer date, on April 30, 2014, Shuomali procured

---

[18]  In the post-petition period, the Debtor managed the 47 Travel Stop operations as an employee for a stated wage.  See Ex. 7.

[19]  Ex. X.

[20]  Dakota A-1, LLC was eventually terminated in December 2013.  Ex. G. at pp. 11-12.

[21]  ¶¶ 6 -7 of the Agreed Facts.  Despite its gross receipts of $812,288 for 2013, Quick Fill suffered a net loss of <$12,066> for that calendar year.  Ex. 14.  Shuomali subsequently terminated Quick Fill, LLC on December 22, 2013.  ¶ 8 of the Agreed Facts; Ex. 19.

[22]  Ex. 3.  This state court petition was filed in the 294th Judicial District Court in and for Van Zandt County under Cause No. 14-00082 and was styled, *E&S Land Development, LP vs Quick Fill, LLC d/b/a  A+ Convenience Store and Yaser Shuomali, Individually.  Id*.

bankruptcy counsel in the Dallas area[23] and filed a voluntary petition under chapter 7 of the Bankruptcy Code in the Dallas Division of the United States Bankruptcy Court of the Northern District of Texas.[24]

52.    James Cunningham (the "Dallas Trustee") was appointed as the Chapter 7 trustee in the case.

53.    The Debtor's original Schedules and Statement of Financial Affairs were filed on May 14, 2014.

54.    The Debtor listed the gross receipts of his independent business entities in his original Statement of Financial Affairs[25] in response to an inquiry seeking the "gross amount of income that the debtor has received in the two years prior to the filing of the bankruptcy petition."[26]

---

[23]  The Debtor was represented by Andrew B. Nichols in the Dallas phase of the case.  He was replaced by Charles Lauffer of Tyler upon transfer of the case and the adversary proceeding to the Eastern District.

[24]  ¶ 1 of the Agreed Facts.

[25]  Official Form 7 presents the following inquiry:

> **1. Income from employment or operation of business**
> State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced.  State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income.  Identify the beginning and ending dates of the debtor's fiscal year.)  If a joint petition is filed, state income for each spouse separately. (Married debtors filing under Chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

[26]  The Debtor's response to Question 1 in his original Statement of Financial Affairs instead listed his "gross amount of income" as follows:

| AMOUNT | SOURCE | |
|---|---|---|
| $8,307.72 | 47 Travel Stop | YTD |
| $13,846.10 | Dakota A1 LLC | 2013 |
| $4,500.00 | Dakota A1 LLC | 2012 |
| $1,594,381.00 | Dakota A1 LLC Business | 2013 |
| $21,692.34 | Quick Fill LLC | 2013 |

-8-

55.     The Debtor listed the various business enterprises that he directed, in whatever form, in response to Question 18 of the original Statement of Financial Affairs.[27]

56.     However, the Debtor failed to list in his original Statement of Financial Affairs the gratuitous transfer of his Pioneer Food Mart, Inc. stock to his brother, Bhaeddin Alshoumali,[28] which had occurred in December 2013, more than eight months after Pioneer had been evicted from the Town & Country store property.

57.     On June 10, 2014, the Dallas Trustee conducted and concluded the required meeting of creditors in the administration of the Dallas bankruptcy case (the "Dallas 341 Meeting"), during which Shuomali was examined under oath.[29]

58.     At the conclusion of the Dallas 341 Meeting, the Dallas Trustee did not request any amendment to the Debtor's schedules.

59.     The Dallas Trustee did not request any additional documentation from the Debtor relating to the issues raised by Ms. Simpson at the meeting or any other concerns.

60.     The Dallas Trustee filed his Report of No Distribution in that case on September 3, 2014, informing creditors that no assets were available in the Shuomali bankruptcy estate for distribution on creditor claims.[30]

61.     Perhaps in response to the perceived passivity of the Dallas Trustee, E&S filed a Motion to Dismiss or, Alternatively, to Transfer Venue, relating to the Debtor's

---

| $3,000.00 | Quick Fill LLC | 2012 |
| $812,288.00 | Quick Fill LLC Business | 2013 |
| $999,283.00 | Quick Fill LLC Business | 2012 |
| $24,000.08 | Pioneer Food Mart, Inc. | 2013 |
| $24,000.00 | Pioneer Food Mart, Inc. | 2012 |

These amounts were repeated in the Debtor's amended SOFA.  Case No. 14-60808 [dkt. #43].

[27]  Ex. 5 at p. 7.

[28]  *Id*. at p. 4.

[29]  *See* Ex. 11 (Dallas 341 Meeting transcript) and Case No. 14-60808 [dkt #3 and #25].

[30]  See docket sheet entry on September 3, 2014  in case no. 14-60808.  Because it has no accompanying documentation, this Trustee Notice of No Distribution is not assigned a docket entry number.

Chapter 7 case, on September 18, 2014.[31]

62.    Following a hearing, the Northern District Bankruptcy Court transferred the Debtor's main bankruptcy case to this Court on November 4, 2014.[32]

63.    Upon receipt of the transferred Chapter 7 case in the Eastern District, a second meeting of creditors (the "Tyler 341 Meeting") was conducted on January 6, 2015.[33]

64.    Mr. John Vardeman, a trial attorney for the Office of the United States Trustee, conducted the Tyler 341 Meeting on behalf of Jason R. Searcy, the duly-appointed Chapter 7 Trustee (the "Tyler Trustee") in Shuomali's new Eastern District case.

65.    At the Tyler 341 Meeting, E&S was allowed significant leeway in questioning the Debtor regarding business assets that were clearly outside the scope of the bankruptcy estate.[34]

66.    Though the Debtor was directed to amend certain segments of the Statement of Financial Affairs, the Tyler 341 Meeting was concluded on the same date that it was convened — January 6, 2015.

67.    Confirming the earlier assessment of the Dallas Trustee, the Tyler Trustee filed a Notice of No Distribution on February 13, 2015, again informing creditors that, after his examination, no assets were available in the Shuomali bankruptcy estate for distribution on creditor claims.[35]

---

[31]    Case No. 14-60808 [dkt. #28 and #29].  E&S filed amended motions the same day. [dkt # 31 and #32]  The Debtor filed his response to these motions on October 24, 2014 [dkt. #33], and the Plaintiff filed a reply on October 27, 2014 [dkt. #34].

[32]    ¶ 1 of the Agreed Facts.

[33]    Case No. 14-60808 [dkt. #39].

[34]    Ex. 12 (Tyler 341 Meeting recording).

[35]    See docket sheet entry on February 13, 2015 in case no. 14-60808. As earlier, because it has no accompanying documentation, the Trustee's Notice of No Distribution was not assigned a docket entry number.  The main bankruptcy case remains open only because of the pendency of this objection to discharge.

*Adversary Complaint*

68.     The Plaintiff filed its complaint in this adversary proceeding in the United States Bankruptcy Court for the Northern District of Texas on August 11, 2014.[36]

69.     In granting the transfer of the underlying bankruptcy case, the Northern District Bankruptcy Court also transferred the adversary proceeding to this Court on November 4, 2014,[37] with Shuomali's motion to dismiss unresolved.[38]

70.     This Court issued an Interim Order regarding the Defendant's pending motion to dismiss, directing the Plaintiff to file an amended complaint before full consideration of the dismissal motion.[39]

71.     The Plaintiff filed its Amended Complaint on February 6, 2015.[40]

72.     Upon consideration of the dismissal motion, this Court subsequently dismissed certain aspects of the Plaintiff's § 727(a)(4)(A) claim, but otherwise denied the dismissal motion.[41]

73.     The Debtor-Defendant answered the Plaintiff's Amended Complaint on April 23, 2015.

*Judgment on Partial Findings - § 523(a)(2)(A)*

74.     During the trial, at the conclusion of the Plaintiff's case-in-chief, the Court granted the Debtor-Defendant's motion for judgment on partial findings on the Plaintiff's dischargeability claim under § 523(a)(2)(A) on the grounds that the evidence offered by the Plaintiff failed to establish the necessary elements of its case.

[36]    *See* dkt # 25 in Case No. 14-60808.  This adversary proceeding, as it was originally filed when the main case was in the Northern District of Texas, was filed as Case No. 14-3110.

[37]    ¶ 1 of the Agreed Facts.

[38]    Dkt #9.

[39]    Dkt #18.

[40]    Dkt #20.

[41]    See *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Adversary Complaint Pursuant to Fed. R. Civ. 12(b)(6)* entered on April 17, 2015 [dkt #22], wherein the Court dismissed with prejudice the Plaintiff's §727(a)(4)(A) claims arising under the referenced subheadings: *Debtor's Multiplicity of Bankruptcy Filings; and Debtor's Children.. Id.* at p. 4.

75.   In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[42] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *see also Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

76.   The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that Shuomali made any knowingly false or fraudulent statement regarding his business experience prior to the execution of the Lease.

77.   The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that it relied upon any statement made by Shuomali regarding his business experience.

78.   The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that any statement made by Shuomali regarding his business experience prior to the execution of the Lease amounted to anything but mere puffery.

79.   As this Court has previously observed,

> Expressions of opinion without any factual underpinning cannot qualify as misrepresentations. *In re Westcap Enter.*, 230 F.3d 717, 726 (5th Cir. 2000). Such expressions qualify as puffery—mere statements of subjective opinion and not objective fact—rather than fraud. *See GJP, Inc. v. Ghosh,* 251 S.W.3d 854, 899 (Tex. App. –Austin 2008, no pet.).

*Page v. Crown Ranch Dev., Ltd. (In re Crown Ranch Dev. Ltd.)*, 2012 WL 1072221, at *5 (Bankr. E.D. Tex., Mar. 29, 2012).

---

[42]   Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance, in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case. *Sears, Roebuck & Co. v. Hernandez (In re Hernandez)*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

80.    E&S was understandably anxious for operations to begin at its Canton property in order to initiate cash flow on its investment.

81.    The Plaintiff's representatives visited the various business enterprises managed by Shuomali prior to the execution of the Lease and they, in Mr. Hamaker's own words, "satisfied" themselves that Shuomali was the right person to operate its Canton property.

82.    To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:

> (1) the debtor made representations;
> (2) at the time they were made the debtor knew they were false;
> (3) the debtor made the representations with the intention and purpose to deceive the creditor;
> (4) the creditor justifiably relied on such representation; and
> (5) the creditor sustained losses as a proximate result of the representations.

> *Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

83.    Believing that Shuomali represented the best alternative for beginning to recoup its investment in the Canton location, and after engaging in the degree of due diligence which they thought was necessary to confirm that selection, the principals of E&S were willing to overlook deficiencies in order to try to initiate operations at the Quick Fill Store.

84.    E&S knowingly allowed Shuomali to take possession of its Canton property without compliance with its insurance requirements.

85.    E&S knowingly allowed Shuomali to occupy and conduct operations at the Quick Fill Store, including the sale of gasoline, without compliance with the insurance requirements.

86.    The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that Shuomali made any knowingly false or fraudulent statement regarding the procurement of insurance prior to the execution of the Lease.

87.    The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief

that Shuomali made any knowingly false or fraudulent statement regarding the procurement of insurance prior to the execution of the Lease with the intention and purpose to deceive the E&S representatives.

88.    The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that it justifiably relied upon any false representation by Shuomali since no such false representation was made to the Plaintiff.

89.    Regardless of any other factor, the Plaintiff wholly failed to offer any proof of damages in its case-in-chief arising from any purported misrepresentation by Shuomali.

90.    The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that any debt owed to it by Shuomali was procured by a false representation or under false pretenses.

91.    The Plaintiff failed to demonstrate by the evidence presented in its case-in-chief that any debt owed to it by Shuomali was procured under circumstances constituting actual fraud.


*Additional Findings Regarding § 727 Claims*

92.    With reference to Ghalia Shomali,[43] the Debtor testified credibly, notwithstanding the identification of Ghalia Shomali as his "wife" in documents prepared by the lending institution when they jointly purchased a duplex in Canton in 2012 for themselves and their adult children,[44] that he and Ghalia had long since divorced and were not married at the time of the purchase of the home.[45]

93.    Though they lived in the same location with their adult children, the Debtor was divorced from Ghalia Shomali when he filed his Chapter 7 petition in the Northern District of Texas in April 2014.

---

[43]  The Debtor properly listed Ghalia Shomali in response to Item 16. Spouses and Former Spouses on his Original SOFA and Amended SOFA.  *See* Case No. 14-60808 [dkts #15 and #43].

[44]  Ex. Q.

[45]  The Debtor testified without contradiction at trial that he and Ghalia utilize separate entrances to the duplex.

-14-

94. Ghalia Shomali married Mr. Tareq Abu Sel on April 8, 2013.[46]

95. The Plaintiff failed to establish by a preponderance of the evidence that the Debtor was married to Ghalia Shomali: (1) at the time he purchased a home with her; (2) at the time he filed his individual bankruptcy petition in this case; or (3) at any subsequent time.

96. The Plaintiff failed to establish by a preponderance of the evidence that the Debtor made a false oath about his marriage status.

97. With regard to the various business entities through which the Debtor engaged in the management of convenience stores,[47] the filing of the voluntary petition in this bankruptcy case triggered a series of legal mischaracterizations which, though perhaps easily adopted by a layman, particularly one with limited English capabilities, should rightfully have been corrected by his attorneys. Those mischaracterizations have permeated the entirety of this case and have caused considerable confusion in the case and in this adversary proceeding.

98. For example, the Debtor's bankruptcy petition erroneously stated that Pioneer Food Mart, Quick Fill and Dakota A-1 constituted trade names through which the Debtor had individually conducted business in the last eight years — as evidenced by the use of the moniker "formerly doing business as."

99. Such references are erroneous. They should have been omitted from the petition altogether and correctly characterized in the appropriate location as independent business entities in which the Debtor held stock or membership interests.[48]

100. No legal basis has been demonstrated upon which the Debtor was required to list the assets of his particular business entities in his personal bankruptcy schedules.

101. The listing of the gross income of these business entities in the Debtor's Statement

---

[46] Ex. 24.

[47] For example, the Debtor in his trial testimony repeatedly referenced corporate or LLC creation documents as his "license" to do business.

[48] The voluntary petition form calls for the disclosure of "All Other Names used by the Debtor in the last 8 years (include married, maiden, and trade names)." With the "assistance" of counsel, the Debtor erroneously listed that he had conducted business as "FDBA Pioneer Food Mart; FDBA Quick Fill DBA A+ Convenience; [and] FDBA Dakota A1 LLC," among others.

-15-

of Financial Affairs was appropriate, but only because Pioneer Food Mart, Inc. and the LLCs had each elected to be classified as a subchapter S corporation for federal income taxation purposes[49] by which the income "passed through" to the Debtor as the sole member of each LLC.[50]

102.    Regardless of the federal taxation treatment provided, the corporation and the single-member LLCs remained as distinct legal entities, with the protection of the Debtor as a corporate shareholder and an LLC member from liability for the debts of those distinct, independent entities remaining intact. *See* 2 TEX. BUS. ORGS. CODE ANN. §§ 21.223 - 21.226 (Vernon 2012) (as to corporations); 3 TEX. BUS. ORGS. CODE ANN. § 101.002 (Vernon 2012) (as to limited liability companies).

103.    Thus, in all aspects with regard to the property of the Debtor's bankruptcy estate, the only property interests pertaining to the corporation and the single-member LLCs which should have been properly included by the Debtor in his schedules and statements was the listing of his stock or membership interests in the various entities in Schedule B and the identification of, and requested information regarding, those various businesses in his Statement of Financial Affairs.[51]

104.    The Court has painstakingly reviewed the recordings of the two § 341 meetings of creditors conducted in Shuomali's bankruptcy case.[52]

105.    Shuomali's business activities, conducted through his various business entities, was discussed at length at both meetings.

106.    Certainly the inquiry into the nature and history of the related businesses at the two 341 meetings was not inappropriate, but such inquiries were material to the

---

[49]  *See, e.g.,* Ex. Q, Y, and Z.

[50]  Current federal tax regulations allow a limited liability company, which is not technically a corporation, to elect its classification status and, specifically, allows an eligible entity with a single owner to be classified as an association (i.e., a corporation), including a Subchapter S corporation, or to be totally disregarded as an entity separate from its owner. 26 C.F.R. § 301.7701–3 (2011). Thus, "if an LLC chooses not to be treated as a corporation, either by affirmative election or by default, its owner will be liable for [tax] debts incurred by the LLC, but there will be no double taxation." *McNamee v. Dept. of the Treasury*, 488 F.3d 100, 109 (2d Cir. 2007).

[51]  The Debtor clearly erred (uncomplained of here) by failing to list his stock and membership interests in response to Question 13 on Schedule B. However, other responses to other questions clearly identified the business interests of the Debtor and the omission did not preclude proper inquiry into such subjects at the creditors' meeting.

[52]  Ex. 11 and 12.

administration of the bankruptcy estate only to the degree that they affected the valuation of the Debtor's stock or membership interests in them.[53]

107.    The record clearly indicates that, even in more prosperous times, the value of the corporate and LLC interests was suspect at best, since each entity held only leasehold interests in the convenience store locations, together with the business inventory of each store.  Any purported value of each LLC was almost entirely dependent upon the actual operational labor tendered by the Debtor and his sons.

108.    That suspect value had deteriorated even further by the petition date, since all of the leasehold interests had been surrendered or sold, and there were no business operations being conducted by those entities which could have conveyed value to the interests now owned by the bankruptcy estate.

109.    There is little evidence in the record to support the supposition that either the Dallas Trustee or the Tyler Trustee was dissatisfied with the level of disclosure or cooperation from the Debtor in this case, particularly with regard to the Debtor's interactions with his wholly-owned entities, Pioneer Food Mart, Inc. or Dakota A-1, LLC.

110.    There is insufficient evidence in the record to support a conclusion that any omissions in the schedules, or confusion arising therefrom, occurred in order to conceal information from the Estate or to preclude either trustee from taking any appropriate action against the Debtor's entities.

111.    Neither the Dallas Trustee nor the Tyler Trustee took any legal action to recognize the assets of the Debtor's various business entities as the assets of the individual Debtor or to recover any transfers as assets which should have been contained in the Debtor's bankruptcy estate on the Petition Date.

112.    Setting aside the effectiveness of the Debtor's termination efforts as to his companies, the integrity of the various business entities as independent legal entities through which the Debtor conducted business has not been legally or equitably compromised.

113.    Yet, E&S essentially (and improperly) seeks to erase the legal distinctions between the ownership of assets by the Debtor-Defendant as an individual and the

---

[53]   Accordingly, some of the directives for actual supplementation of the schedules and statements regarding the activities of the non-debtor businesses arising from the Tyler 341 Meeting were questionable.

ownership of assets by the corporation and the various LLCs in which the Defendant owns all or substantially all of the membership interests.

114.   The transfer of assets[54] from Dakota A-1, LLC to Tareq Abu Sel's 47 Travel Stop, Inc. was a transfer of non-debtor assets that did not constitute a transfer of property belonging to the Debtor which was required to be reported under Question 10 of the original Statement of Financial Affairs.

115.   With regard to the transfer of assets by Dakota A-1, LLC, the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Debtor transferred, removed or concealed any property actually owned by him in his individual capacity within one year before the filing of his bankruptcy petition.

116.   With regard to the transfer of assets by Dakota A-1, LLC, the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Debtor transferred, removed or concealed any property with an intent to hinder, delay or defraud a creditor or an officer of the estate.

117.   With regard to the transfer of assets by Dakota A-1, LLC, the Plaintiff has failed to demonstrate by a preponderance of the evidence that any false statement made by the Debtor regarding the transfer of assets by Dakota A-1, LLC was made with a fraudulent intent, given that the transfer did not involve estate property and that the scheduled information, to any degree it had to be scheduled at all, was substantially supplemented and developed in the Debtor's § 341 testimony.

118.   With regard to the transfer of assets by Dakota A-1, LLC, the Plaintiff has failed to demonstrate by a preponderance of the evidence that any false statement made by the Debtor regarding the transfer of assets by Dakota A-1, LLC was material to the bankruptcy case and its administration.

119.   With regard to the transfer of assets by Dakota A-1, LLC, the Plaintiff has failed to establish by a preponderance of the evidence that the Debtor knowingly and fraudulently made a false oath or account.

120.   Clearly the Debtor's initial failures to acknowledge the transfer of the Pioneer Food Mart, Inc. stock were erroneous, material to the estate at least in a definitional sense, and should have been avoided, notwithstanding the fact that the omissions were facilitated by the Debtor's language barrier and exacerbated by the

---

[54]   Once again, those assets consisted of the sale of the LLC's leasehold interest and its inventory located at the leased location.

failures of his initial legal counsel.[55]

121.   However, the impact of those initial errors upon the estate and its creditors was significantly ameliorated by the detailed discussion of the occurrences regarding Pioneer Food Mart, Inc. operations which occurred at both § 341 meetings.[56]

122.   Upon transfer of his stock in Pioneer Food Mart, Inc., which occurred after its business operations had been terminated for months, the Debtor did not retain any benefit or use of the stock for his personal benefit after the transfer.

123.   The Debtor's transfer of his stock in Pioneer Food Mart, Inc. did not really affect his financial condition, as Pioneer had forfeited its rights under the leasehold months earlier and the Debtor remained liable as a responsible person for the corporation's failure to collect and to remit sales taxes.

124.   Though asset value does not solely determine the materiality of any omission, the record is clear that the Debtor's transfer of the Pioneer stock was not an effective exchange for value since all of its business operations had been terminated months earlier by its eviction from its leasehold and that it had also been previously burdened with the sales tax assessments by the State of Texas.[57]

125.   In evaluating the totality of circumstances, including the failure of several parties, including the Plaintiff, to observe the proper boundaries of the bankruptcy estate, the ineffective assistance of counsel provided to the Debtor to correctly establish, and diligently observe, those boundaries, and the Debtor's own misperceptions about the legal ramifications of conducting business through various entities, such circumstances and the general chronology of events precludes a finding that the Debtor's omissions were the product of actual fraud.

---

[55]   Undoubtedly the Debtor's attorney should have been more circumspect in the creation of the schedules and statements from the information supplied by the Debtor and the Debtor's review of them, in light of his challenges in communicating in English, should have been more focused and diligent.

[56]   Ex. 11 and 12.  Under supervision of his successor attorney, the Debtor corrected the written omission of the transfer in his Amended Statement of Financial Affairs which he filed on February 6, 2015, one month after the Debtor's Tyler 341 Meeting.  *See* Ex. 6 at 4 and 10.

[57]   To the degree that the Debtor testified at the Dallas 341 Meeting that Pioneer had a value of approximately $20,000.00 to $25,000.00 when he transferred his interest, it is likely a reference to the estimated value of the inventory still on the leasehold premises from which Pioneer had been banned. There is no evidence in the record to support that as a valid business valuation, particularly in light of the unpaid sales tax assessments, or a valid value for the Debtor's stock.

126. The examination of those circumstances also fail to reveal a degree of carelessness by the Debtor that rises to the level of a reckless indifference to the truth.

127. To the degree that he was required to do so to overcome any presumption of fraudulent intent, the Debtor demonstrated by a preponderance of the evidence that he had no fraudulent intent in the transfer of the Pioneer Food Mart, Inc. stock.

128. The Plaintiff has failed to demonstrate by a preponderance of the evidence that, through any omissions from his schedules, the Debtor concealed his interests in his various business entities with an actual intent to hinder, delay, or defraud creditors.

129. The Plaintiff has failed to demonstrate by a preponderance of the evidence, notwithstanding any confusion regarding the various business activities of the Debtor's corporation or his solely-managed LLCs, that the Debtor concealed his interests in his various business entities with an actual intent to hinder, delay, or defraud creditors.

130. With regard to the Debtor's transfer of the Pioneer Food Mart, Inc. stock, the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Debtor concealed that stock transfer with an actual intent to hinder, delay or defraud creditors.

131. With regard to the Debtor's transfer of the Pioneer Food Mart, Inc. stock, the Plaintiff has failed to demonstrate by a preponderance of the evidence that any false statement made by the Debtor regarding that stock transfer was made with a fraudulent intent.

132. The Plaintiff has failed to demonstrate by a preponderance of the evidence that, through the omissions from his schedules, the Debtor made a false statement with an actual fraudulent intent.

133. The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Debtor made a false oral statement while under oath with an actual fraudulent intent.

134. With regard to the Debtor's transfer of the Pioneer Food Mart, Inc. stock, the Plaintiff has failed to establish by a preponderance of the evidence that the Debtor knowingly and fraudulently made a false oath or account.

135.    The errors committed by the Debtor in this case do not warrant the invocation of the drastic penalty inflicted by a denial of the Debtor's discharge.

136.    To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

1.    The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§ 1334 and § 157.

2.    This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I), and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.    The Bankruptcy Code requires that a debtor be granted a discharge unless one of the statutory grounds for denial of that discharge is proven.  11 U.S.C. § 727(a).

4.    The denial of a debtor's discharge is considered an extreme remedy.  *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).

5.    "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Matl's Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004) (citing *Ichinose v. Homer Nat'l Bank (In re Ichinose)*, 946 F.2d 1169, 1172 (5th Cir. 1991)).

6.    A denial of discharge is to be imposed only upon those debtors who have not been honest and forthcoming about their affairs and therefore have not fulfilled the duties of full disclosure required of a bankruptcy debtor.  *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."].

7.    Thus, speculation and surmise about the existence of such misconduct are insufficient.  Probative evidence must be presented.

8.    To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of §727(a) are construed strictly against parties seeking to deny the

granting of a debtor's discharge and liberally in favor of a debtor. *Laughlin v. Nouveau Body & Tan, L.L.C. (In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010); *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010).

9.  The same construction principles favoring a debtor are imposed in an action to determine the dischargeability of a particular debt. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997)).

10. The Plaintiff bears the burden of proving that the Debtor is not entitled to a discharge under § 727.  The standard of proof for its claim is a preponderance of the evidence. *Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992).

11. A preponderance of the evidence standard also applies to the determination of the dischargeability of a particular debt. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

*Applicable Non-Bankruptcy Law*

12. It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to corporate property is vested in the corporation and not in the owners of the corporate stock. *Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 331 (5th Cir. 1984).  In other words, property owned by a corporation is not the property of the shareholders. *Id.; Gonzales v. Dallas County Appraisal Dist*., 2015 WL 3866530, at *3 (Tex. App.—Dallas June 23, 2015, no pet.).

13. Texas also permits the formation of a limited liability company as an alternative to the formation of a corporation. Tex. Bus. Orgs. Code Ann. § 101.001, et.seq. (Vernon 2012).

14. Generically, a limited liability company works somewhat like an incorporated partnership.  The company provides protection from personal liability for business debts as in a corporation, while avoiding a second level of federal taxation. *Shook v. Walden,* 368 S.W.3d 604, 613 (Tex. App.– Austin 2012, pet. denied).

15. Such protection from liability is not forfeited due to the singular fact that a single-member LLC may elect through the IRS' check-the-box regulations to be

disregarded as a separate taxable entity for the purposes of federal income taxation.

16.    "Reverse veil-piercing, which is a common-law rather than a statutory doctrine in Texas, instead counts the assets of a corporation or other entity as the assets of its shareholder." *Hill v. Orea (In re Juliet Homes, L.P.),* 2011 WL 6817928 at *18 (Bankr. S.D. Tex., Dec. 28, 2011).

17.    The reverse veil-piercing doctrine "appl[ies] the traditional veil piercing doctrine in reverse, so that a *corporation's* assets are held accountable for the liabilities of *individuals* who treated the corporation as their alter ego." *Cadle Co. v. Brunswick Homes, L.L.C. (In re Moore)*, 379 B.R. 284, 292 (Bankr. N.D. Tex. 2007) (emphasis in original) (citing *Zahra Spiritual Trust v. United States,* 910 F.2d 240, 243 (5th Cir. 1990)).

18.    The application of veil-piercing principles, and particularly those of *reverse* veil-piercing, is rather problematic when dealing with an individual's role with a limited liability company, particularly with a single-member LLC.  Because many smaller LLC's are managed by few members, perhaps a single member, who are actively involved in all phases of the LLC's business, the disregard of corporate formalities — one of the key factors in veil-piercing determinations — is simply inapplicable.  "It makes no sense to imperil the shield simply because the members do not undergo meaningless formalities such as formal meetings."  Carter G. Bishop & Daniel S. Kleinberger, LIMITED LIABILITY COMPANIES: TAX AND BUSINESS LAW ¶ 6.03 at *3 (Thomson Reuters Tax and Accounting 2014).

19.    Accordingly, the Texas legislature has subjected the applicability of veil-piercing principles in an LLC context to the same limitations which it had previously imposed as to corporations generally, including the general concept that the corporate veil may not be pierced in Texas based on failure to follow corporate formalities. See TEX. BUS. ORGS. CODE ANN. §101.002 (Vernon 2012), incorporating the protections provided to the shareholders and/or beneficial owners of Texas corporations against liability for corporate obligations under TEX. BUS. ORGS. CODE ANN. §§21.223 - 21.226 (Vernon 2012).

20.    Those business organization statutes generally allow veil-piercing only upon proof of actual fraud for the direct personal benefit of a shareholder based upon a showing of dishonesty of purpose or an intent to deceive.  *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.);  *Ingalls v. SMTC Mfg. (In re SMTC Mfg.)*, 421 B.R. 251, 324 (Bankr. W.D. Tex. 2009).

*§ 727(a)(2)(A): Transfer or Concealment of Property.*

21.    Section 727(a)(2)(A) provides:

The court shall grant the debtor a discharge unless —

the debtor, with intent to hinder, delay, or defraud a creditor
or an officer of the estate . . . has transferred, removed,
destroyed, mutilated, or concealed, or has permitted to be
transferred, removed, destroyed, mutilated, or concealed —

property of the debtor, within one year before
the date of the filing of the petition. . . .

22.    In order to establish grounds for denial of a discharge under § 727(a)(2)(A), a
plaintiff must demonstrate by a preponderance of the evidence that there was:
(1) a transfer or concealment of property;
(2) belonging to the debtor;
(3) within one year of the filing of the petition; and
(4) performed with an intent to hinder, delay or defraud a creditor or an officer of
    the estate.

*Judgment Factors, LLC v. Packer ( In re Packer)*, 816 F.3d 87, 92–93 (5th Cir.
2016); *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).

23.    The second requirement for denying a discharge under § 727(a)(2) is that the
property which is transferred, concealed or removed be property of the debtor or
property of the estate.

24.    "Under the second element of § 727(a), a relevant concealment can occur only if
property of the debtor is concealed."  *Cadle Co. v. Friedheim ( In re Friedheim)*,
277 Fed. App'x. 485, 489 (5th Cir. 2008).

25.    As one court has described this requirement,

According to the plain language of the statute, there must be a
disposition of "property of the debtor." Relying on this
language, courts have recognized that section 727(a)(2)(A) is
concerned with the disposition of property in which the debtor
has a "direct proprietary interest."  Therefore, section

**-24-**

> 727(a)(2)(A) does not apply when the disposition involves
> property belonging to someone, or some entity, other than the
> debtor, even if the transfer may cause an incidental effect
> upon the debtor's assets. . . . When a corporation is a bona fide
> entity distinct from an individual debtor-shareholder, courts
> have applied the above-stated principle to hold that transfers
> of property belonging to the corporation are outside the scope
> of section 727(a)(2)(A).

*Wachovia Bank, N.A. v. Spitko (In re Spitko),* 357 B.R. 272, 299 (Bankr. E.D. Pa. 2006) (citations omitted).

26.   "A debtor who is a shareholder in a corporation will not be denied a discharge based on transfer of or injury to corporate property.  The plaintiff has the burden to establish that the property is property of the estate.  It is not because the debtor/shareholder is not the owner of property of the corporation. The property interest of the debtor and the debtor's estate is limited to the stock certificates." *BankUnited, N.A. v. Lehmann (In re Lehmann),* 511 B.R. 729, 735 (Bankr. M.D. Pa. 2014), cited in *Wan Ho Indus. Co., Ltd. v. Hemken (In re Hemken)*, 513 B.R. 344, 361 (Bankr. E.D. Wis. 2014).

27.   "Property owned by a corporation of which the debtor is a shareholder does not constitute property of the debtor's bankruptcy estate.  [Such] properties were not required to be disclosed by the debtor in his schedules, and it is therefore difficult to see how any fraud or other act leading to denial of discharge arose by this over-inclusion." *Manning v. Watkins (In re Watkins)*, 474 B.R. 625, 649 (Bankr. N.D. Ind. 2012) (citing *Fowler v. Shadel*, 400 F.3d 1016, 1019 (7th Cir. 2005)).

28.   "In order to justify the refusal of discharge under a section 727(a)(2) transfer, it must be shown that there was an actual transfer of valuable property *belonging to the debtor* which reduced the assets available to creditors and which was made with fraudulent intent." *Id.* at 633 (emphasis added) (citing *Lee Supply Corp. v. Agnew ( In re Agnew)*, 818 F.2d 1284, 1287 (7th Cir. 1987)).

29.   It is widely recognized that a plaintiff must demonstrate . . . an <u>actual</u> intent to hinder, delay, or defraud creditors to prevail on a §727(a)(2) claim — a constructive intent is insufficient.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 384 (Bankr. E.D. Tex. 2009) *(citing Chastant*, 873 F.2d at 91).

30.   However, "[c]ourts are reluctant to accept a debtor's self-serving statement of her intent as the best evidence of that intent."  *Fiala v. Lindemann (In re Lindemann)*,

375 B.R. 450, 466 (Bankr. N.D. Ill. 2007).

31.     Thus, the existence of actual fraud "may be inferred from the actions of the debtor
        and may be proven by circumstantial evidence." *Herman v. Jackson (In re
        Herman)*, 396 F. App'x 108, 110 (5th Cir. 2010) (citing *Chastant*, 873 F.2d at 91);
        *Lowry v. Croft (In re Croft)*, 500 B.R. 823, 852 (Bankr. W.D. Tex. 2013).

32.     Some of the factors that show actual intent to defraud:
        (1) the lack or inadequacy of consideration;
        (2) the family, friendship or close associate relationship between the parties;
        (3) the retention of possession, benefit or use of the property in question;
        (4) the financial condition of the party sought to be charged both before and after
            the transaction in question;
        (5) the existence or cumulative effect of the pattern or series of transactions or
            course of conduct after the incurring of debt, onset of financial difficulties,
            or pendency or threat of suits by creditors; and
        (6) the general chronology of the events and transactions under inquiry.

        *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005).

33.     When a debtor transfers property to relatives, there is also a presumption of
        fraudulent intent that arises and, once attached, "the burden shifts to the debtor to
        demonstrate that he lacked fraudulent intent." *Id.*

34.     Because the Plaintiff has failed to sustain its burden of proof to show by a
        preponderance of the evidence that the Debtor transferred, removed or concealed
        any individually-owned property within a year of his bankruptcy filing with an
        actual intent to hinder, delay or defraud creditors, the relief sought by the Plaintiff
        under § 727(a)(2)(A) must be denied.


*§ 727(a)(4)(A): False Oaths.*

35.     Section 727(a)(4)(A) provides:

        The court shall grant the debtor a discharge unless —

        (4) the debtor knowingly and fraudulently, in or in connection with the case—
            (A) made a false oath or account . . . .

36.     "The purpose of § 727(a)(4)(A) is to enforce a debtor's duty of disclosure and to

ensure that the Debtor provides reliable information to those who have an interest in the administration of the estate.  Thus, complete financial disclosure is a condition precedent to the privilege of discharge." *Lindemann,* 375 B.R. at 469 (citations and quotations omitted).

37.    "False oaths sufficient to justify the denial of discharge include: (1) a false statement or omission in the debtor's schedules; or (2) a false statement by the debtor at the examination during the course of the proceedings." *Beaubouef ,* 966 F.2d at 178.

38.    However, not every misstatement or omission in the schedules constitutes a false oath.  As one court has noted,

> Section 727(a)(4) does not, however, operate to penalize debtors for honest mistakes or misstatements.  To be sure, courts acknowledge that petitions, schedules, and statements are often filed hastily, memories fail, and innocent mistakes and omissions can occur, and will be understanding of that reality so long as the evidence does not reveal an underlying intent to deceive.

*Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 783–84 (Bankr. E.D. Va. 2012) (citations and internal quotations omitted).

39.    Indeed, even multiple errors do not mandate the finding of a false oath without sufficient evidence of a fraudulent intent.  *First United Bank & Trust Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 432 (Bankr. E.D. Tex. 2013), *aff'd*, 783 F.3d 302 (5th Cir. 2015).

40.    As the objecting party, the Plaintiff carries the burden of proof under § 727(a)(4) (A) and must demonstrate by a preponderance of evidence that:
        (1) the debtor made a statement under oath;
        (2) the statement was false;
        (3) the debtor knew the statement was false;
        (4) the debtor made the statement with fraudulent intent; and
        (5) the statement materially related to the bankruptcy case.

*Packer,* 816 F.3d at 94;  *Cadle Co. v. Duncan (In re Duncan),* 541 F.3d 688, 695 (5th Cir. 2009).

41.     If a plaintiff establishes a *prima facie* case that a debtor made a materially false statement, then the burden shifts to the debtor to present evidence that he or she is innocent of the charged offense. *Id*. at 696.

42.     A plaintiff in a § 727(a)(4)(A) action must demonstrate by a preponderance of the evidence an actual intent to hinder, delay, or defraud creditors — a constructive intent is insufficient. *Harwood*, 404 B.R. at 384 (citing *Chastant,* 873 F.2d at 91).

43.     In most circumstances only the debtor can testify directly concerning his or her intent and "rare will be the debtor who willingly provides direct evidence of a fraudulent intent." *Neary v. Darby (In re Darby)*, 376 B.R. 534, 541 (Bankr. E.D. Tex. 2007).  Instead, the existence of a fraudulent intent is most often betrayed by an examination of a course of conduct. *Id.; see also First Tex. Savings Assoc. v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1989).

44.     Thus, "[f]raudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth." *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see also*, *Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382-83 (5th Cir. 2001).

45.     A false statement or omission is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 692 (Bankr. E.D. Tex. 2009) (*citing Duncan*, 562 F.3d at 695).[58]

46.     Because the Plaintiff has failed to sustain its burden of proof to show by a preponderance of the evidence that any false statement made under oath by the Debtor in this case was made with a fraudulent intent, and/or was material to the administration of the estate, the relief sought by the Plaintiff under § 727(a)(4)(A) must be denied.

---

[58] However, a finding of materiality is admittedly not dependent solely upon the value of the omitted assets or whether the omission was detrimental to creditors. *Pratt*, 411 F.3d at 566.

*Fed. R. Civ. P. 52(c): Judgment on Partial Findings.*

47.   Federal Rule of Civil Procedure 52(c), as incorporated into bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7052, states that:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED. R. CIV. P. 52(c).

48.   "In a bench trial, a judgment entered after the plaintiff's case in chief is appropriately decided under Federal Rule of Civil Procedure 52(c)(1) which provides for a judgment on partial findings." *Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959, 963-64 (5th Cir. 2016).

49.   Judgment against a plaintiff and in favor of a defendant is appropriate "when the court, even before hearing the defendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding the necessary elements of his case."  *In re Cornerstone E & P Co., L.P.*, 436 B.R. 830, 858 (Bankr. N.D. Tex. 2010) (quoting *duPont v. S. Nat'l Bank*, 771 F.2d 874, 879 (5th Cir. 1985)).

50.   "In reaching this determination, the court may weigh evidence, make credibility judgments, and even draw inferences unfavorable to the plaintiffs."  *Id.* (citing *N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1333 (5th Cir. 1986)).

51.   However, the rule does not "demand punctilious detail or slavish tracing of the claims issue by issue and witness by witness.  Rather, a court's findings are sufficient to satisfy Rule 52(a) and (c) if the memorandum affords the reviewing court a clear understanding of the factual basis for the trial court's decision." *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., LLC*, 2016 WL 3077405, at *6-7 (S.D. Tex., June 1, 2016) (citing *Century Marine, Inc. v. U.S.*, 153 F.3d 225, 231 (5th Cir. 1998) and *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985)).

*Nondischargeability Under § 523(a)(2)(A):  Debt Arising from False Pretenses, False Representation or Actual Fraud.*

52.     The Plaintiff's Complaint further seeks a determination that the debt owed to it should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

53.     11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

54.     Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[59] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *Pentecost*, 44 F.3d at 1291.

55.     The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bercier*, 934 F.2d at 692 [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].[60]

---

[59]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59 (1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in § 523(a)(2)(A) from that utilized in § 523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[60]  While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit

56.    To have a debt excepted from discharge pursuant to the "actual fraud" provision in
       § 523(a)(2)(A), an objecting creditor must prove that:

>      (1) the debtor made representations;
>      (2) at the time they were made the debtor knew they were false;
>      (3) the debtor made the representations with the intention and purpose to
>          deceive the creditor;
>      (4) the creditor justifiably relied on such representation; and
>      (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court
decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of
reliance].

57.    A debt may also be declared non-dischargeable if it was obtained by false
       pretenses or by a false representation.  While "false pretenses" and "false
       representation" both involve intentional conduct intended to create and foster a
       false impression, the distinction is that a false representation involves an express
       statement, while a claim of false pretenses may be premised on misleading conduct
       without an explicit statement. *See Harwood,* 404 B.R. at 389; *Wallace v. Davis (In
       re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007).

58.    In order for a debtor's representation to constitute a false pretense or a false
       representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2)
       describing past or current facts, (3) that [was] relied upon by the other party."[61]
       *Pentecost,* 44 F.3d at 1292-93; *Allison*, 960 F.2d at 483; *see also Bercier*, 934 F.2d
       at 692 ["to be a false representation or false pretense under § 523(a)(2), the false
       representations and false pretenses must encompass statements that falsely purport

---

statement. *See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v.
Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).  In order for a debtor's
representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing
and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other
party." *Allison*, 960 F.2d at 483; *see Bercier*, 934 F.2d at 692 ["to be a false representation or false
pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that
falsely purport to depict current or past facts"].

[61]  Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance
required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance,
in addition to reliance in fact, is the correct level of reliance required to sustain a finding of
nondischargeability in a false pretense or false representation case.  *Sears, Roebuck & Co. v. Hernandez
(In re Hernandez)*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

to depict current or past facts"].

59. All substantive aspects of § 523(a)(2)(A) are triggered by this complaint.

60. The Plaintiff's case-in-chief failed to demonstrate the existence of a knowing and fraudulent falsehood issued by Shuomali upon which E&S relied prior to the execution of the Lease.

61. The Plaintiff's case-in-chief failed to demonstrate that Shuomali issued a knowingly false statement regarding future intentions for the purpose of deceiving E&S and upon which E&S relied.

62. The Plaintiff's case-in-chief failed to offer any proof that E&S suffered damages as a result of the Debtor's allegedly wrongful conduct.

63. Such failure is dispositive and mandates the entry of judgment in favor of the Debtor-Defendant on the Plaintiff's cause of action under § 523(a)(2)(A).

64. Because the Court concludes that the Plaintiff has failed to prove by a preponderance of the evidence that its alleged claim amount was obtained by actual fraud, judgment on partial findings was rendered at trial in favor of the Debtor-Defendant on this § 523(a)(2)(A) claim.

## CONCLUSION

65. Based upon the Court's conclusions that the Plaintiff, E&S Land Development, L.P., has failed to prove by a preponderance of the evidence its causes of action under either of the referenced subsections of 11 U.S.C. § 727(a) and the Court's conclusion at trial that the Plaintiff had failed to demonstrate the existence of all of the requisite elements of 11 U.S.C. § 523(a)(2)(A) by the evidence presented in its case-in-chief, all relief sought by the Plaintiff's Complaint must be denied and judgment must be rendered for the Debtor-Defendant, Yaser Shuomali, in this action.

66. The Court further concludes that the Debtor-Defendant, Yaser Shuomali, is entitled to the entry of a discharge order pursuant to 11 U.S.C. § 727(a).

67. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

68.    An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 09/16/2016

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE